UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:17-cr-00103-KJD-PAL |
| Plaintiff, | **REPORT OF FINDINGS AND RECOMMENDATION** |
| v. | |
| NICHOLAS BRODIGAN, | (Mot. to Suppress – ECF No. 99) |
| Defendant. | |

Before the court is defendant Nicholas Brodigan's ("Brodigan") Motion to Suppress Statements (ECF No. 99). This motion was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice. The court has reviewed the motion, the government's Response (ECF No. 107), Brodigan's Reply (ECF No. 127), and considered the arguments of counsel at the evidentiary hearing conducted December 4, 2018. Nisha Brooks-Whittington and Raquel Lazo appeared on behalf of Brodigan, and Christopher Burton and Brian Whang appeared on behalf of the government.

## <u>BACKGROUND</u>

Brodigan is charged with conspiracy to interfere with commerce by robbery in violation of 18 U.S.C. § 1951; three counts of interference with commerce by robbery, aiding and abetting in violation of 18 U.S.C. § 1951 and § 2; and three counts of use of a firearm during an in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) and § 2 for robberies that occurred on or between March 13 and 19, 2017.

Brodigan made his initial appearance on April 7, 2017, pled not guilty, and was detained following a detention hearing. The trial date was initially set for June 5, 2017, however, the parties have stipulated to multiple extensions of the pretrial motion and trial date. The parties also stipulated to multiple extensions of the deadline to brief the pending motion to suppress, which

was initially filed on August 6, 2018.  Trial is currently set on April 22, 2019, with calendar call on April 16, 2019.  *See* Stipulation (ECF No. 143), Order (ECF No. 144).

Mr. Brodigan is charged in an Indictment (ECF No. 1) returned April 4, 2017, along with co-defendants Justin Castro and Victoria Commisso.[1]  The Indictment arises out of three alleged robberies that occurred between March 13 and March 19, 2017.  The Indictment alleges that on March 13th, defendants Brodigan and Castro entered the Lowe's Home Improvement store on N. Nellis Boulevard in Las Vegas.  Castro was armed with a semi-automatic handgun openly carried in a holster on his hip.  Castro and Brodigan went to the tool department, took merchandise, walked past all points of sale and towards the store's exit.  An employee confronted them, and Castro placed his hand on his holstered gun telling the clerk to "move out of the way or get shot."  Castro and Brodigan then fled.

On March 19th, Castro and Brodigan allegedly walked into a Home Depot store located on S. Lamb Boulevard in Las Vegas.  Castro was armed with a semiautomatic handgun openly carried in a holster on his hip.  Castro and Brodigan went to the tool department, selected merchandise, and proceeded to walk out of the store.  While doing so, Castro placed his hand around the handle of his holstered firearm.  An employee attempted to prevent Castro and Brodigan from fleeing but stopped when the employee realized Castro was armed.  Castro and Brodigan allegedly fled in a vehicle driven by Commisso.

Thirty minutes after the second robbery, Commisso and Castro allegedly entered a Home Depot on S. Pecos Road in Las Vegas.  Castro was again armed with a semi-automatic handgun openly carried on his hip.  Commisso and Castro went directly to the tool department, selected merchandise, and walked toward the exit.  A store employee again attempted to stop the defendants from leaving without paying for the merchandise.  Castro pulled his firearm out of its holster, pointed it at the employee, and told him to "back off."  Commisso and Castro left the store and entered a Hyundai Brodigan had parked close to the entrance.  Brodigan then drove all three defendants away from the store.

/ / /

---

[1]  Mr. Castro pleaded guilty and has been sentenced.

## I.    The Parties' Positions

### A.  Brodigan's Motion

Brodigan requested an evidentiary hearing on his motion to suppress statements.  He argues that his statements to police following his arrest on March 20, 2017, must be suppressed for three reasons.  First, he argues police obtained a statement by violating his rights under *Miranda*.  Second, he contends his statements were involuntary under the totality of the circumstances and obtained in violation of his Fifth Amendment right.  Third, he argues in the alternative that if he received adequate *Miranda* warnings, the officers violated his rights when he unequivocally invoked his right to counsel and was questioned without an attorney present.

### B.  The Government's Response

The government opposes the motion arguing the undisputed evidence demonstrates that Brodigan received and voluntarily waived his rights under *Miranda*.  The government also contends that Brodigan's statement to detectives was voluntary.  The government argues that a transcript of the recorded interview establishes that Detective Nelson made it clear that Brodigan was being arrested and was going to jail for charged offenses regardless of what he said.  The government provided the court with an audio recording from the defendant's recorded interview, which lasted approximate 1 hour and 45 minutes.  The government maintains it corroborates the tone of the interview and that Detective Nelson did not raise his voice or otherwise threaten Brodigan.  The fact that Brodigan was in custody while interviewed does not render those statements involuntary.  Additionally, Brodigan's personal characteristics do not demonstrate that his will was overborne by police conduct.

The government acknowledges that if a suspect invokes his right to counsel, all questioning must cease unless the suspect himself reinitiates interaction with the police.  However, in this case, Brodigan did not unequivocally invoke his right to counsel.  According to the transcript of the interview, Brodigan asked Detective Nelson "what if I wanted a lawyer?"  Detective Nelson advised Brodigan that invoking his right to counsel would end the interview.  Brodigan indicated he understood invoking his right to counsel would terminate the interview but continued with the interview with Detective Nelson for approximately 90 minutes.    The recorded interview

demonstrates that Brodigan did not unequivocally invoke, but only acknowledged that he understood Detective Nelson's answer to his question. As such, the interview properly continued.

### C. Brodigan's Reply

The reply points out that the government concedes Brodigan was in custody at the time he was interrogated. Brodigan disputes that he received and waived *Miranda* rights prior to speaking with Detective Nelson. An evidentiary hearing is requested to require the government to meet its burden of establishing Brodigan received and waived *Miranda* warnings. At an evidentiary hearing, the totality of the circumstances will demonstrate that Brodigan's statements were obtained by physical or psychological coercion or by improper inducement overcoming his will. Brodigan was in handcuffs, placed in a locked patrol car, and surrounded by police officers at the time of his initial interrogation. Detective Nelson told Brodigan that Brodigan was giving him the "runaround" and that he needed to think about what he was going to say. Additionally, Detective Nelson made continual promises of leniency to get Brodigan to confess. Finally, at two points during the recorded interview, Brodigan stated that he wanted counsel. On the first occasion, Brodigan stated "what if I said I wanted a lawyer, or—or whatever?" The second time was after Detective Nelson stated Brodigan definitely had the right to a lawyer, "but the thing is that when you—if you say you want a lawyer…." Mr. Brodigan responded, "yeah." Brodigan maintains that after this exchange, the interrogation should have ceased, citing *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010).

## II.    Evidentiary Hearing

At the evidentiary hearing, the government called two detectives from the Las Vegas Metropolitan Police Department ("LVMPD"), Detectives Steven Junge and Jason Nelson.

### A. Testimony of Detective Junge

Detective Junge retired in October 2017 after 27 years as an LVMPD police officer. At the time of his retirement, he was a sergeant in the robbery/detective section supervising eight robbery detectives.

On March 20, 2017, at approximately 4:00 a.m., he was dispatched to the vicinity of Sahara Avenue and Hollywood Boulevard in Las Vegas. A suspect vehicle involved in this case had been

located and a suspect, later identified as Nicholas Brodigan, had been taken into custody. He identified Brodigan in court. His role was to supervise the scene, supervise the detectives, and ensure that protocol was followed. There was also a motorcycle accident that had occurred as part of the pursuit of the suspect vehicle.

At the scene, Detective Junge learned that Brodigan was in the back seat of a patrol car just south of the traffic circle at Sahara and Hollywood. Junge accompanied Detective Nelson to speak with Brodigan standing outside of the patrol car. No one else was present at that time. At the time of his initial encounter with Brodigan, Brodigan was seated in the rear seat of the patrol car in handcuffs. Detective Nelson introduced himself and had Brodigan get out of the patrol car and conducted a short interview. Brodigan was standing right inside the open rear door of the patrol car. Junge was standing in front of the open door by the front passenger door. Detective Nelson was closer to the rear of the car. Nelson estimated that he was three or four feet from Brodigan.

Detective Nelson introduced himself and gave Brodigan his *Miranda* rights from a pre-printed LVMPD advisement of rights card that most detectives carry in their notepad. Although it is not required by LMVPD, Junge always required his detectives to read *Miranda* rights from the preprinted card. It "simplifies the process and ensures that nothin's forgotten and all the i's are dotted and the t's are crossed." Junge observed Detective Nelson read Brodigan his *Miranda* rights. Brodigan acknowledged he understood his rights with a verbal yes. Detective Nelson had a short interview with Brodigan who admitted being in the car during the pursuit and identified himself on still image on Detective Nelson's cellphone. The image was a surveillance video from the robbery. Nelson asked Brodigan who the driver of the vehicle "who was still outstanding," was and Brodigan began to give vague replies. Detective Nelson concluded the interview and placed Brodigan back in the rear seat of the patrol car still in handcuffs. Nelson and Junge then continued with processing the crime scene and moving forward with the investigation.

Junge was in civilian dress at the scene wearing police identification around his neck and armed with a service weapon on his right hip concealed underneath his shirt. Detective Nelson was also in civilian clothing and armed with a service weapon. At no point did Junge or Nelson unholster or brandish their service weapons or display them during the interview with Brodigan.

1        On cross-examination, Junge testified that when he arrived at the scene, Brodigan was

2   already in the patrol vehicle.  Junge estimated he arrived at the scene shortly after 4:00 a.m.  Junge

3   was called to the scene after Brodigan had been apprehended.  Junge was told Brodigan was

4   apprehended from a fleeing vehicle being pursued by the police.  When Junge arrived at the scene,

5   there were multiple officers present.  There were at least four or five officers and there could have

6   been more.  There were two suspects that were fleeing from a vehicle and multiple officers were

7   dispatched.  There was also an accident and the scene needed to be protected.  Junge estimated

8   there were probably ten officers present.

9        Junge and Detective Nelson arrived in separate vehicles pretty close in time.  Junge and

10  Detective Nelson both contacted Mr. Brodigan at the same time.  Junge did not know how long

11  Brodigan had been in the back seat of the patrol vehicle when they first made contact.  He estimated

12  it would have taken 20 to 25 minutes to arrive at the scene after receiving the call.  At the scene

13  he was briefed by other officers.  He estimated that briefing took 5 to 10 minutes.

14       Junge saw Detective Nelson read Brodigan his rights from a Metro-issued *Miranda* card.

15  The detectives did not have Brodigan execute a written waiver, although they could have.  Junge

16  did not know whether any officers present at the scene had a written waiver form.  Detective Junge

17  had a Metro-issued weapon on him, but it was not visible.  He did not recall if Detective Nelson's

18  weapon was visible.  After Detective Nelson read *Miranda* warnings, he showed Brodigan a

19  photograph to get Brodigan to identify himself as the person in the photograph.  Nelson also tried

20  to get Brodigan to discuss or implicate another individual involved in the robberies.  When

21  Brodigan did not want to talk about that, the detectives put him back into the patrol vehicle.  Junge

22  did not recall whether Detective Nelson told Brodigan to sit and think about if he really wanted to

23  talk or not.  Detective Nelson may have.  Brodigan was transported in a patrol car by other officers

24  to the Metro office.

25       Detectives at the scene included Smith, Hanshew, and Nelson who worked for Junge.

26  Detectives Archer and Parkette did not work for him.  Junge did not recall whether Detective Smith

27  was at the Sahara and Hollywood location.  He believed Detective Hanshew was there.  There

28  were two separate scenes.  Detective Smith and Hanshew ended up going to a different scene in

1    the downtown area of town where the suspect vehicle was located.

2           Junge was not wearing a bodycam and was not aware whether officers at the scene had

3    bodycams.  The reason some officers wear bodycams is to document facts and record contacts

4    with citizens they arrest.  Junge did not think to ask any officers to capture the *Miranda*

5    advisement.  Detective Junge did not audio or video record the advisement and waiver.

6           **B.  Testimony of Detective Jason Nelson**

7           Detective Nelson is currently employed as a detective with LVMPD.  He has been with the

8    department as detective for approximately 13 years.  He was assigned to investigate a string of

9    robberies of home improvement stores between March 14 and 19, 2017.  There were a number of

10   suspects and a potential suspect vehicle identified as part of the investigation.

11          On March 20, 2017, he received a call at approximately 4:00 a.m. regarding the

12   investigation.  He was informed patrol officers were in a vehicle pursuit with the suspect vehicle

13   from the robberies and that they had people in custody.  Detective Nelson responded to the scene

14   with Detective Sam Smith and Sergeant Junge.  Junge was the supervisor at the time.  When Nelson

15   arrived, he was informed patrol officers had identified a suspect, Nicholas Brodigan.  He identified

16   Brodigan in court.  When Nelson first saw Brodigan, he was in the back seat of the patrol car in

17   handcuffs.  Nelson spoke with Brodigan with Sergeant Steve Junge.  Junge was there to find out

18   the details of what had happened pertaining to the robbery investigation and to listen to Brodigan's

19   answers.  The purpose of the initial conversation Nelson had with Brodigan was to see if Brodigan

20   was involved in the robberies and to identify who the other people in the vehicle were.  At that

21   point, the vehicle was still "outstanding" and at times had been pursued by police officers.  Officers

22   wanted to know who was in the vehicle because it was still at large.

23          Nelson believed there were three suspects involved in the string of robberies.  Two were

24   "still outstanding".  Nelson was in casual dress when he first spoke with Brodigan.  Nelson

25   identified himself verbally and was wearing a lanyard with police identification.  He had a firearm

26   on his right hip underneath his shirt.  Nelson approached the patrol car and introduced himself to

27   Brodigan as a detective with LVMPD and asked Brodigan to step outside.  Brodigan was

28   interviewed in the doorway of the patrol vehicle.  Nelson was not sure whether Sergeant Junge

identified himself as a police officer.

Nelson described Brodigan's demeanor on first contact with him as concerned, but not upset. Brodigan did not appear threatened. Nelson read Brodigan *Miranda* rights from a pre-printed card. He read the rights line-for-line and asked Brodigan if he understood. He identified government's proposed Exhibit 1 as a copy of his LVMPD *Miranda* card that was used to advise Brodigan of his rights. Exhibit 1 was admitted and Detective Nelson read the rights from the card into the record. Detective Nelson always uses the card "because that way I can never be wrong." Nelson asked Brodigan whether he understood his rights and Brodigan answered yes. Nelson memorialized the advisement and Brodigan's response in his arrest report. He did not record the *Miranda* rights or the subsequent conversations with Brodigan because he did not have the means to do so at the time. At the station and the office, audio and video recording is available. At the time he *Mirandized* Brodigan, he did not have a digital audio recorder he usually kept in his vehicle to record interviews with him, "and we're not required by law or policy."

During the initial conversation, Nelson was just trying to learn some immediate facts to help with the investigation and did not intend to go in depth with Brodigan. Nelson briefly interviewed Brodigan. He showed Brodigan a photograph of Brodigan entering one of the retail establishments and Brodigan identified himself in the photograph. Nelson also showed Brodigan a picture of a co-defendant and Brodigan did not give Nelson the suspect's name. Nelson testified at this point "we started kind of talking in circles." Brodigan did not give Nelson any definitive names of co-defendants.

At no point did Nelson verbally threaten Brodigan or unholster his firearm. Sergeant Junge did not verbally threaten Brodigan or unholster his firearm in Nelson's presence. Nelson decided to stop the interview. Brodigan did not invoke his right to remain silent or to an attorney while they were talking at the patrol vehicle.

Nelson examined government's proposed Exhibit 2, a SCOPE, local criminal history printed out of a database, referring to Brodigan. It documented Brodigan's local law enforcement contacts. Defense counsel objected to admission of the exhibit as hearsay. The government offered the exhibit as evidence of Brodigan's local law enforcement contacts. The exhibit was

1   conditionally admitted subject to cross-examination.

2      A longer interview was conducted at LVMPD headquarters in an interview and

3   interrogation room. The interview room used for Brodigan was approximately 8-by-8 with a table

4   with a hook used to attach handcuffs to keep a suspect detained at the table. The room is audio

5   and video recorded. Brodigan was detained with one handcuff on his hand so that he could not

6   leave. Brodigan was under arrest for robbery. The interview room was in a secured area of

7   headquarters.

8      Detective Nelson listened to parts of the audio recording prior to testifying. Portions of the

9   interview were played in open court. Detective Nelson recognized the recording as the beginning

10  of his recorded interview with Brodigan. At the beginning of the interview, Detective Nelson said

11  "alright, do you remember the rights that I read you out on the street?" He was referring to the

12  *Miranda* rights that he read Brodigan from the card at the custody location. Brodigan replied in

13  the affirmative with the words "mh-hm." Detective Nelson did not stop and then restart the

14  recorded interview at any point. A portion of the recorded interview at timestamp 26:15 to 27 was

15  played in court. Nelson recalled Brodigan saying something to the effect of "what would happen

16  if I wanted to lawyer up?" Nelson answered the question but did not consider that Brodigan was

17  invoking his right to counsel because it was not a definitive statement and was broad and vague.

18  Nelson continued to interview Brodigan. Nelson heard Brodigan answer "yeah" and "I know"

19  when Nelson described what would happen if he invoked his right to counsel. Nelson did not

20  consider Brodigan's response to be an invocation of right to counsel because he believed Brodigan

21  was agreeing with Nelson that he needed to explain himself and how his involvement was minimal

22  compared to other co-defendants. At no point during the recorded interview did Brodigan invoke

23  his right to counsel or right to remain silent. Nelson did not recall Brodigan using the word

24  "lawyer" or "attorney" through the remainder of the interview.

25     During the interview, Brodigan was concerned and "became a little elated once he found

26  out that he was being charged with robbery," and realized the gravity of what was occurring.

27  Brodigan seemed to understand Nelson's questions and responded appropriately. Brodigan

28  avoided answering some questions and was hesitant to identify other people involved in the

1    robberies.  Brodigan did not appear to be under the influence during the interview.

2          Nelson was armed but did not unholster his firearm or make any verbal threats to Brodigan.

3    Nelson did not make any promises to Brodigan.

4          On cross-examination Detective Nelson testified that on March 20, 2017, he received a

5    phone call advising him that there was car pursuit related to some robberies he had been

6    investigating.  He was home in bed at 4:00 a.m. when he received the call.  He estimated it took

7    5 to 10 minutes for him to get dressed, and approximately 25 minutes to get to the east Sahara and

8    South Hollywood location.  He arrived in a Nissan Maxima, which is a work car but "a plain

9    vehicle."  He estimated there were 5 or 6 other officers at the scene when he arrived.  He learned

10   that the suspect, Mr. Brodigan, was already in the patrol vehicle and had been sitting there for 30

11   minutes.  When Detective Nelson approached the patrol vehicle, Brodigan was seated inside in

12   handcuffs.  Nelson did not recall whether Sergeant Junge was present when he initially arrived,

13   but both arrived at approximately the same time.

14         Brodigan was in custody and the detective positioned themselves so that there was no way

15   he could have escaped.  Brodigan was formally arrested.

16         Detective Nelson did not video record the advisement of rights from the *Miranda* card.

17   The department provides bodycam video for patrol officers.  There were patrol officers on the

18   scene, but Detective Nelson did not ask anyone to come over with their body cameras to record

19   the encounter.  Detective Nelson does not carry a *Miranda* waiver form, but they are available and

20   provided by the department.

21         When Detective Nelson approached the patrol car and looked at Brodigan, he realized he

22   resembled one of the individuals involved in the robberies.  Detective Nelson wanted to ask

23   Brodigan questions about that.  The encounter was going to be brief and he was going to spend

24   more time with Brodigan at the station later.  Nelson decided to *Mirandize* Brodigan even though

25   he knew the conversation would be brief.  Detective Nelson knew it was not true that Brodigan

26   did not recognize other individuals in the surveillance photo.  Nelson believed Brodigan was giving

27   him the runaround.  This was why he decided to end the conversation.  Detective Nelson definitely

28   gave Brodigan the impression that they would be speaking again.

Detective Nelson was shown a copy of the arrest report he authored. The arrest report reflects that Detective Nelson told Brodigan to think about what he wanted to tell Nelson before placing Brodigan in the rear of the patrol vehicle. The report reflects Detective Nelson asked Brodigan about Suspect No. 1 and Brodigan began to give him the runaround.

Brodigan was transported to the police station at 400 South Martin Luther King Drive approximately 10 miles from the scene. Nelson estimated it took approximately 20 minutes in travel time to get to the station. Officer Kaposta drove Brodigan to headquarters. Detective Nelson did not recall if he stayed at the scene or went to a secondary location but he did some further investigation after initially speaking to Brodigan. Nelson could not recall how long that took. Nelson went to a secondary location and eventually went to headquarters. He did not recall whether he immediately started the interview with Brodigan or took care of other things before speaking with him again. Time stamps on the video would tell how long Brodigan had been sitting at the station before Detective Nelson arrived.

There was no window in the interview room where Brodigan was hooked up with one handcuff to the table. An audio and video of the interview was provided to the government. Defense counsel requested a copy of the video recording, indicating she had only received an audio recording. Government counsel stated he did not realize there was also a video recording and would follow up with the detective after the hearing to secure a copy.[2] The first thing Detective Nelson said to Brodigan on entering the room was to ask whether he went by Nick or Nicholas. He then asked whether Brodigan remembered the rights that were read out on the street. Detective Nelson did not repeat those rights during the audio recording portion of the interview. It would have been a best practice to do so. In retrospect, he would have called a patrol officer over and had the officer videotape the advisement in the field. That is his practice now, but at the time, bodycams were new to the police department and he did not choose that option.

At headquarters, Detective Nelson did not ask Brodigan whether he wanted to speak with

---

[2] Counsel for both sides conferred after the hearing and advised the court that the audio recording both sides had also contained video. However, neither side realized the disk contained video recording because it required a proprietary program to run. The court received an openable copy of the audio/visual disk on December 26, 2018.

him.  Detective Nelson just began speaking to Brodigan.  Detective Nelson did not ask Brodigan whether he was waiving his rights or ask Brodigan to sign a waiver form.  A waiver form would have been available.  Detective Nelson agreed that the interview lasted at least 1 hour and 47 minutes.  Detective Nelson has listened to the recording and read the transcription of the recording.  Detective Nelson was handed a copy of the transcribed interview.  It is a true and fair representation of the conversation he had with Brodigan.  At some point Brodigan asked about having a cigarette and Detective Nelson said something to the effect that once they were done if everything went well he could have one.

Detective Nelson told Brodigan that there was a possibility he may not go to prison.  There was never a time when Brodigan asked for an attorney.  Detective Nelson believed that Brodigan used the term "what if I lawyer up?" or words to that effect.  Detective Nelson told Brodigan he had the right to have an attorney and explained that if an attorney got involved Nelson could no longer talk to Brodigan and continued questioning Brodigan.  Detective Nelson never confirmed with Brodigan whether he wanted Nelson to stop questioning him.  Detective Nelson also did not confirm that Brodigan did not want an attorney present.  Detective Nelson just continued with the questioning and Brodigan answered his questions.

Detective Nelson did not verify the accuracy of information on the SCOPE report for Brodigan that was conditionally admitted as government's Exhibit 2.  The information is input by law enforcement support technicians and is not always accurate.  Defense counsel therefore asked that the court find the exhibit inadmissible.  Government counsel indicated that the purpose of the exhibit was to show Brodigan's familiarity with the criminal justice system, not to show whether he had been convicted of any of the offenses on the report.  The government argued that Brodigan's familiarity with the criminal justice system is a factor that goes towards his waiver of his *Miranda* rights and voluntariness of his statements.

In response to questions posed by the court, Detective Nelson testified that he knew the entry for Brodigan's arrest in this investigation was accurate, but did not have any information concerning the accuracy of any of the other arrest history or conviction history of other charges contained in the SCOPE report.  The court therefore sustained the defense objection to the exhibit.

On redirect, Detective Nelson testified that he explained to Brodigan the consequences if he were to lawyer up.  Brodigan indicated he understood those consequences and continued to speak with Detective Nelson after that.  Detective Nelson did not promise Brodigan that he would not go to prison if he confessed or cooperated.  Detective Nelson did not tell Brodigan that he would go to prison if he did not cooperate or tell Brodigan it was up to him whether he went to prison or not.  At some point, Detective Nelson told Brodigan that no matter what he said, Brodigan was going to be arrested and go to jail.  Detective Nelson told Brodigan that the district attorney was going to be involved in what, if anything, happened to Brodigan.

The court referred Detective Nelson to the page of the voluntary transcribed statement, Bates No. 0114, and asked him to read the page to himself.  *See* Sealed Mot. Ex. B (ECF No. 100) at 32.  Nelson recognized this as an exchange he had with Brodigan in which Brodigan inquired "what if I wanted a lawyer or whatever?"  Detective Nelson testified he believed that statement was inaccurate and that when you listen to the audio, the statement Brodigan made was "what if I wanted to lawyer up or whatever?"  Detective Nelson acknowledged that the term "lawyer up" is an expression police officers use, but believed "if we listen to the audio, that's what I heard."  He believed the transcript may be inaccurate in this regard.  He thinks both statements "what if I wanted to lawyer up?" or "what if I wanted a lawyer or whatever?" were similar or the same.  At several points in the transcript, the transcriber inserts the word "crosstalk."  Detective Nelson has listened to this portion of the tape to determine whether he could discern what, if anything, was intelligible in the crosstalk, but could not tell.  Detective Nelson acknowledged that after telling Brodigan "you definitely have the right, but the thing is that when you—if you say you want a lawyer . . ." he trailed off.  Brodigan responded, "Yeah, and  - and I know . . . ."  Detective Nelson testified he took Brodigan's response as an indication "he was goin' down the road to asking for an attorney and I did not want him to ask for an attorney—."  Detective Nelson acknowledged that he deliberately cut Brodigan off so he could keep questioning him.

The government rested.  Defense counsel indicated the defense had no witnesses or evidence to present.  The court canvassed Brodigan to determine whether he understood his right to testify or not at the hearing.  Brodigan stated that he understood his right, had discussed the

1  matter with counsel, was satisfied with the representation he had received to date and after

2  conferring with counsel he had decided not to testify.

3  **DISCUSSION**

4      The Fifth Amendment guarantees that no person "shall be compelled in any criminal case

5  to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436

6  (1966), the Supreme Court held that the Fifth Amendment affords a citizen the right to be informed

7  prior to custodial interrogation that "he has the right to remain silent, that anything he says can be

8  used against him in a court of law, that he has the right to the presence of an attorney, and that if

9  he cannot afford an attorney, one will be appointed for him prior to any questioning." *Id.* at 479.

10  The government has the burden of proving, by a preponderance of the evidence, that a confession

11  is voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The government must also establish by

12  a preponderance of the evidence that a defendant waived his protection against self-incrimination

13  under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

14      **I.    The Standard for Conducting an Evidentiary Hearing.**

15      Brodigan's motion to suppress requested an evidentiary hearing claiming his statements

16  were involuntary because he was surrounded by armed police officers, placed in handcuffs in a

17  locked patrol car, and interrogated by officers without receiving proper *Miranda* rights. The

18  motion claimed that while being interrogated by police he unequivocally and unambiguously

19  invoked his right to counsel. The motion also asserted an evidentiary hearing was required because

20  the government has the burden of proof to establish adequate *Miranda* warnings were received

21  and waived, and that a confession is voluntary.

22      "An evidentiary hearing on a motion to suppress need be held only when the moving papers

23  allege facts with sufficient definiteness, clarity, and specificity, to enable the trial court to conclude

24  that contested issues of fact existed." *United States v. Howell*, 431 F.3d 615, 620–21 (9th Cir.

25  2000) (holding it was not an abuse discretion to decline to hold an evidentiary hearing where the

26  defendant only "submitted a boilerplate motion that relied wholly on the fact that the government

27  has the burden of proof to establish adequate *Miranda* warnings.") (citations omitted)).

28      The motion to suppress did not allege facts with sufficient definiteness, clarity, and

sufficiency to enable to court to conclude contested issues of fact existed. The court reluctantly granted an evidentiary hearing because Brodigan claimed his confession was involuntary because he was promised leniency, he was subjected to a lengthy custodial interrogation at police headquarters, and during his interrogation at police headquarters he unequivocally and unambiguously asserted his right to counsel.

### II.    Brodigan Received and Waived *Miranda* Rights.

*Miranda* warnings are required when a suspect in custody is interrogated by police. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). For a suspect's statement to be admissible, the government must establish that the defendant received and waived *Miranda* rights. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To be admissible a statement made by a suspect in custody must have been voluntary in the sense that it was the produce of a free and deliberate choice rather than intimidation, coercion, or deception, and the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *Berghuis*, 560 U.S. at 382 (citing *Moran*, 475 U.S. at 421). A suspect's waiver of his *Miranda* rights can be express or implied. *Id.* at 388–89 (finding that a suspect who has received and understood the *Miranda* warnings waives that right by providing police with an uncoerced statement).

In this case it is undisputed that Brodigan was in custody at the time he was interrogated initially at the patrol car by Detective Nelson, and subsequently at police headquarters. Brodigan's motion argues the discovery in this case was inadequate to establish that he received and waived *Miranda* warnings. During the evidentiary hearing, both Detectives Nelson and Junge testified that Brodigan received and waived *Miranda* warnings. The court found both detectives credible that Detective Nelson read Brodigan his *Miranda* rights from the standard LVMPD pre-printed advisement of rights card provided by LVMPD to its officers. Detective Nelson read the rights that were on the card into the record at the evidentiary hearing. Brodigan does not claim that the rights he received failed to comport with the requirements of *Miranda*.

1    The court also found the detectives credible that Brodigan acknowledged understanding

2  his rights and agreed to talk with Detective Nelson.  The court has reviewed the audio and video

3  record of the interview at LVMPD headquarters in its entirety.  At the beginning of the interview

4  at headquarters, Detective Nelson asked Brodigan "do you remember the rights that I read to you

5  out on the street?".  Brodigan responded in the affirmative.

6    Counsel for Brodigan suggested during cross-examination that the officers should have

7  video and audio recorded the advisement of rights in the field from a patrol officer's bodycam.

8  However, the motion cites no case supporting the proposition that an audio or video recording is

9  required to meet the government's burden of proof.  Detective Nelson testified that bodycams were

10  relatively new to the department at the time of Brodigan's arrest, they were issued to patrol officers

11  but not detectives, and it did not occur to him to video and audio record the statement in the field.

12  He also testified that neither department policy nor the law requires audio or video or recording of

13  an arrestee's statement.  No Supreme Court or Ninth Circuit case requires or suggests an audio or

14  video recording is required to meet the government's burden of showing that Brodigan received

15  and waived Miranda warnings.

16    Counsel for Brodigan also suggested during cross-examination that detectives should have

17  obtained a written waiver of *Miranda* rights.  Both detectives acknowledged that LVMPD has

18  written waiver forms available.  However, neither detective requested or attempted to obtain a

19  copy of the form either at the initial scene of the arrest or at police headquarters.  The Ninth Circuit

20  has held that the presence or absence of a signed written waiver is a factor for the court to consider

21  in determining under the totality of the circumstances whether a waiver has occurred.  *United*

22  *States. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007).  The test for determining whether a valid

23  waiver of *Miranda* rights has occurred under the totality of the circumstances involves a

24  determination of whether the defendant was aware of the nature of the right being abandoned and

25  the consequences of the decision to abandon it.  *United States v. Younger*, 398 F.3d 1179, 1185

26  (9th Cir. 2005); *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) ("A valid waiver of

27  *Miranda* rights depends on the totality of the circumstances including the background, experience,

28  and conduct of the defendant.").  The Ninth Circuit has expressly held "in soliciting a waiver of

*Miranda* rights, police officers need not use a waiver form or ask explicitly whether the defendant intends to waive his or her rights." *Younger*, 398 F.3d at 1185 (citations omitted).

The court found the detectives credible and is satisfied Brodigan was aware of his rights and the consequences of giving them up when he agreed to answer Detective Nelson's questions both at the scene and later at police headquarters.

Finally, counsel suggested during cross-examination that Detective Nelson should have re-administered *Miranda* rights before interrogating Brodigan at police headquarters. Based on the testimony of the detectives about when they received the callout and the time it took to get to the scene and receive a preliminary briefing, Brodigan was initially interviewed by Detective Nelson at the scene between approximately 5:00 to 5:30 a.m. Brodigan was then transported to police headquarters by a patrol officer while Detective Nelson conducted additional investigation before going to headquarters to interview Brodigan in more detail. The time stamp on the recording at police headquarters begins at approximately 6:38 a.m. Detective Nelson was the only officer to questions Brodigan at the scene and at headquarters. Neither the Supreme Court nor the Ninth Circuit has imposed any requirement to re-administer *Miranda* warnings "after the passage of time or a change in questioners." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128 (9th Cir. 2005) (citation omitted). The mere lapse of time between the initial administration of *Miranda* rights and further questionings does not require re-administration of rights. *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995) (finding questioning continued one day after rights were given did not require that defendant be readvised of his *Miranda* rights).

### III.    Brodigan Did Not Invoke His Right to Counsel.

Brodigan next argues that his rights were violated because he unequivocally invoked his right to counsel during questioning at police headquarters. In *Edwards v. Arizona*, 451 U.S. 477, 485 (1981), the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights." *Edwards* held that after a suspect has invoked the right to counsel, law enforcement may not interrogate the suspect further until counsel has been made available to him,

"unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*

In cases decided after *Edwards*, the Supreme Court has reinforced the rule that police-initiated interrogation is prohibited unless the accused has counsel with him at the time of questioning and has characterized the *Edwards* rule as "rigid" and "prophylactic." *See, e.g.*, *Maryland v. Shatzer*, 559 U.S. 98, 108 n.3 (2010) (referring to "*Edwards'* super-prophylactic rule"); *Davis v. United States*, 512 U.S. 452, 458 (1994); *Smith v. Illinois*, 469 U.S. 91, 95 (1984).

The motion to suppress argues that Brodigan unequivocally and unambiguously invoked his right to counsel based on the following exchange with Detective Nelson:

| Brodigan: | What if I said I wanted a lawyer or—or whatever? |
|---|---|
| Det. Nelson: | You—you can—you, you know, you definitely have the right, but the thing is that when you—if you say you want a lawyer… |
| Brodigan: | Yeah and—and I know… |
| (crosstalk) | |
| Det. Nelson: | …then I gotta stop—I gotta stop talking to you and I can't ask you anything more.  I can't let you explain yourself anymore.  And that's just the way it is.  And this is the only time that you and I are gonna talk.  I'm not going to ever talk to you, you know, not in jail or anything like that or in court or anything like that.  And what I'm looking at is—well, let me ask you this—so after the one—because the other one—how come you didn't go in on the other one?  How come you stayed at the car? |

*See* Sealed Mot. Ex. B (ECF No. 100) at 32, Tr. of Voluntary Statement., Bates No. 0114.

Brodigan argues it is clear from this exchange that he wanted a lawyer and Detective Nelson should have stopped questioning him until a lawyer was made available, but Detective Nelson ignored his request and continued questioning him.  During the evidentiary hearing, Detective Nelson recalled Brodigan saying something to the effect of, "what would happen if I wanted to lawyer up?"  Nelson testified he answered the question but did not consider that

Brodigan was invoking his right to counsel because it was not a definitive statement. Nelson heard Brodigan answer "yeah" and "I know" when Nelson acknowledge that Brodigan had the right to counsel and describe what would happen if he invoked. Detective Nelson did not consider Brodigan's response to his acknowledgement that Brodigan had the right to counsel to be an invocation of the right to counsel because he believed Brodigan was agreeing with Nelson that he needed to explain himself about how his involvement was minimal compared to the other co-defendants.

On cross-examination, Detective Nelson reiterated that he believed Brodigan used the term "what if I lawyer up?" or words to that effect. Nelson told Brodigan that he had the right to have an attorney and explained that if an attorney got involved, Nelson could no longer talk to Brodigan. Detective Nelson acknowledged that he then continued questioning Brodigan and did not confirm with Brodigan whether he wanted Nelson to stop questioning him or wanted an attorney present. Nelson just continued with the questioning and Brodigan continued answering his questions.

In response to questions posed by the court about the exchange regarding a lawyer, Detective Nelson testified that although the transcript of the recorded interview states "what if I wanted a lawyer or whatever?" he believed that the transcript was inaccurate and when one listened to the audio. The statement Brodigan made was "what if I wanted to lawyer up or whatever?" He acknowledged that the term "lawyer up" is an expression police officers use, but reiterated "if we listen to the audio, that's what I heard." He also testified that he believed both statements "what if I wanted to lawyer up?" or "what if I wanted a lawyer or whatever?" were similar or the same. The court has reviewed the audio and video recorded interview at police headquarters in its entirety. There is unintelligible crosstalk between Brodigan and Detective Nelson at this point during the interview. At multiple points during the interview, Brodigan and Detective Nelson interrupted one another. None of the crosstalk is intelligible. Having listened to the audio recording, Brodigan may have stated "what if I wanted to lawyer up?" or "what if I wanted a lawyer or whatever?". He seemed to pause after the word "lawyer" and the word that followed could have been "up" or "uh." The court finds there is no real distinction between the two phrases, and Brodigan's statement was not a clear an unambiguous request for counsel. The phrase "what

if" is inherently equivocal.  At most Brodigan conveyed to Detective Nelson that he was thinking about asking for an attorney.  Detective Nelson admitted he continued questioning Brodigan without stopping to clarify whether Brodigan intended to invoke. The Supreme Court has held that an ambiguous request for counsel does not require an officer to cease questioning when a suspect in custody makes an equivocal "what if" statement about a lawyer.  *Davis v. United States*, 512 U.S. 452, 458–59 (1994).

A request for counsel must be unambiguous or unequivocal.  *Sechrest v. Ignacio*, 549 F.3d 789, 805–06 (9th Cir. 2008) (citing *Davis*, 512 U.S. at 458–59).  The test for determining whether a statement is an unambiguous request for counsel is an objective one.  *Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir. 2004) (citing *Davis*, 512 U.S. at 458–59).  An ambiguous request for counsel does not require the cessation of questioning if a reasonable officer in  the circumstances would understand only that the defendant might want an attorney.  *Davis*, 512 U.S. at 458–62.  In *Davis*, the Supreme Court found that the defendant's statement, "maybe I should talk to a lawyer," was an ambiguous request for counsel that did not require questioning to stop.  *Id.*  In *Paulino*, the Ninth Circuit held that the defendant's statements, "where's the attorney" and "you mean it's gonna take him long to come" were not an unambiguous request for counsel.  *Paulino*, 371 F.3d at 1086–88.  Similarly, in *Clark v. Murphy*, 331 F.3d 1062, 1071 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 438 U.S. 63, 71 (2003), the Ninth Circuit held that the defendant's statement, "I think I would like to talk to an attorney," was not an unambiguous request for counsel.

In this case, Detective Nelson acknowledged that after the exchange about a lawyer he did not complete his sentence and trailed off.  Detective Nelson testified he took Brodigan's statement as an indication "he was goin' down the road for asking for an attorney and I did not want him to ask for an attorney—."  Detective Nelson candidly acknowledged that he deliberately cut Brodigan off so that he could keep questioning Brodigan.  Brodigan continued with the interview and did not subsequently mention wanting a lawyer.  The court finds that the exchange Brodigan relies on in his motion to suppress does not constitute an unambiguous request for counsel that required cessation of the interview.  Brodigan's "what if" statement is far more equivocal than the "I think

I would like to talk to an attorney" statement the Ninth Circuit found ambiguous in *Clark v Murphy*. 331 F.3d at 1071. Moreover, Brodigan continued to answer Detective Nelson's questions, and on multiple occasions before and after the exchange about a lawyer, Brodigan asked Detective Nelson questions. For example, he asked for the specifics of what he was under arrest for, expressed incredulity that he could be charged for armed robbery because he did not have a gun, and asked Detective Nelson to explain how he could be charged with armed robbery and burglary based on his conduct.

When Detective Nelson finished the interview of Brodigan at headquarters, he advised Brodigan that he was about to talk with co-defendant Commisso and that Brodigan was going to jail at the detention center. Detective Nelson told Brodigan "I'll be back to talk to you in a little bit and make sure you're okay, all right?" *See* Sealed Mot. Ex. B (ECF No. 100) at 56, Bates No. 0138. The audio/video recording shows that, after Detective Nelson left Brodigan to question Commisso, Brodigan remained in the interview room alone for several minutes. At one point another plain clothes police officer came in to check on him.[3] Brodigan was manipulating the hand cuffed to the table and the officer asked whether Brodigan was trying to get out of his handcuffs. Brodigan answered he was not.

After the officer left, Brodigan continued to manipulate the hand in the handcuff. Several minutes later, Brodigan called out and the plain clothes officer returned to the room. Brodigan told the plain clothes officer he wanted to talk to Detective Nelson. A few minutes later, Detective Nelson entered the interview room. The transcribed statement accurately relates that Detective Nelson entered the room asking, "What's up?" *Id.* Brodigan initiated this portion of the interview and continued to talk with Detective Nelson. Detective Nelson asked, "What other questions you got?" *Id.* at 57, Bates No. 0139. Brodigan responded, "Dude, I—I mean, is there anything I can do, please?" *Id.* Detective Nelson explained that he was going to take Brodigan to jail to get booked. *Id.* He also explained that after booking "I'll have the district attorney talk to your attorney once you get one appointed and then see if we can't work something out." *Id.* Brodigan responded "okay." *Id.* Detective Nelson also told Brodigan that "if anyone deserves a break in

---

[3] The exchange between the plain clothes officer and Brodigan was not transcribed.

1    this I think it's you … of the three people involved I think you're the only one that deserves any

2    kind of consideration." *Id.*   Brodigan was pleading with Detective Nelson not to take him to jail.

3    However, at no point did Brodigan ask for a lawyer.

### IV.   Brodigan's Statements Were Voluntary

5        Finally, Brodigan argues that his statements were involuntary under the totality of the

6    circumstances.  A voluntary statement is "one that is the product of a rational intellect and a free

7    will." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011); *see also Blackburn v. Alabama*, 361

8    U.S. 199, 208 (1960)).  The government bears burden of showing a confession is voluntary, *J.D.B.*

9    *v. N. Carolina*, 564 U.S. 261, 269 (2011), and must do so by a preponderance of the evidence.

10    *United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477,

11    489 (1972)); *United States v. McDuffy*, 194 F. Supp. 3d 1054, 1068 (D. Nev. 2016).  In evaluating

12    voluntariness, the test is whether "the government obtained the statement by physical or

13    psychological coercion or by improper inducement," *United States v. Male Juvenile*, 280 F.3d

14    1008, 1022 (9th Cir. 2002), such that the "defendant's will was overborne" by the surrounding

15    circumstances.  *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting

16    *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).

17        Coercive police activity is a necessary predicate for a finding that a confession is not

18    voluntary.  *Brown*, 644 F.3d at 979; *see also Colorado v. Connelly*, 479 U.S. 157, 164 (1986)

19    (providing examples of police overreaching, including lengthy questioning, deprivation of food or

20    sleep, physical threats of harm, and forms of psychological persuasion).  "Coercive police activity

21    can be the result of either physical intimidation or psychological pressure."  *Brown*, 644 F.3d at

22    979 (internal citation omitted).  "The factors to be considered include the degree of police coercion;

23    the length, location and continuity of the interrogation; and the defendant's maturity, education,

24    physical condition, mental health, and age." *Id.* (citing *Withrow v. Williams*, 507 U.S. 680, 693–

25    94 (1993); *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004)).

26        Cases finding coercive police conduct generally involve manifestly outrageous law

27    enforcement conduct.  *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (finding that

28    statement could not have been voluntary where defendant was in the hospital in near coma

condition, and in great pain, while fastened to tubes, needles, and a breathing apparatus); *Haynes v. Washington*, 373 U.S. 503, 511–12 (1963) (invalidating confession where suspect was held for over five days and never advised of his rights); *Ashcraft v. Tennessee*, 322 U.S. 143, 149–54 (1944) (invalidating confession because police questioned suspect for thirty-six hours straight); *Henry v. Kernan*, 197 F.3d 1021, 1028 (9th Cir. 1999) (finding confession was involuntary because detectives admittedly continued the interrogation after the suspect clearly invoked his *Miranda* rights); *California Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1046 (9th Cir. 1999) (finding coercive interrogation because the police disregarded the suspect's *Miranda* rights); *United States v. Tingle*, 658 F.2d 1332, 1335–36 (9th Cir. 1981) (finding confession involuntary when officer recited a litany of maximum penalties for the suspect's alleged crimes, expressly stated that the suspect would not see her child "for a while, and warned the suspect that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed").

A statement "may not be admitted if because of mental illness, drugs, or intoxication, the statement was not the product of a rational intellect." *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (confession was voluntary despite defendant suffering heroin withdrawal, shaking and trembling, and telling agents they needed to hurry if they wanted to continue the interrogation). However, a statement is not involuntary simply because the defendant suffers from a mental illness or is intoxicated. *See, e.g.*, *United States v. Heller*, 551 F.3d 1108, 1112–13 (9th Cir. 2009) (confession voluntary although defendant ingested 7.5 mg of Tylenol III with codeine, which made him tired and caused his hands to shake uncontrollably).; *United States v. Rodriguez-Rodriguez*, 364 F.3d 1142, 1146 (9th Cir. 2004) (confession was voluntary despite defendant's heroin withdrawal because defendant was alert, coherent, and oriented), *amended on other grounds*, 393 F.3d 849 (9th Cir. 2005); *United States v. Banks* 282 F.3d 699, 706 (9th Cir. 2002) (confession made in a drug or alcohol-induced state is voluntary if it remains "the product of a rational intellect and a free will"); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (defendant's symptoms of heroin withdrawal, including lethargy and physical discomfort, did not render his statements involuntary); *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (confession voluntary because defendant's intoxication did not overcome his free will; defendant was able to

drive, obey officers' instructions, and was cooperative in talking with them); *United States v. Martin*, 781 F.2d 671, 674 (9th Cir. 1985) (type, dosage, and schedule of painkilling narcotic administered to defendant was insufficient to overbear defendant's will to resist questioning or impair his rational faculties).

"The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Connelly*, 479 U.S. at 170 (citing *United States v. Washington*, 431 U.S. 181, 187 (1977)). A "defendant's mental condition, *by itself and apart from its relation to official coercion*" is not dispositive of "the inquiry into constitutional voluntariness." *Preston*, 751 F.3d at 1019 (quoting *Connelly*, 479 U.S. at 164) (emphasis in original) (internal quotation marks omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In the absence of coercion, mental and emotional instability do not render an intelligible and alert voluntary statement inadmissible. *Preston*, 751 F.3d at 1019 (quoting *Connelly*, 479 U.S. at 164).

Brodigan's motion to suppress does not claim that he was intoxicated by drugs or alcohol at the time he made his statements. Counsel for Brodigan also did not suggest during cross-examination at the evidentiary hearing that Brodigan was under the influence or suffering from mental illness. However, during the interview at headquarters, Brodigan told Detective Nelson that he had been hanging out with Castro for about a week using drugs with him. Having reviewed the audio and video recording of the interview at police headquarters, the court finds Brodigan was alert, oriented, and responsive to Detective Nelson's questions. Although incredulous that he was under arrest for armed robbery and clearly upset, he did not exhibit any mental or emotional instability which would render his statements inadmissible.

The motion to suppress argues that Brodigan's statement was involuntary and obtained in violation of his Fifth Amendment right under the totality of the circumstances. Brodigan argues his confession was involuntary under the totality of the circumstances because (1) he has no serious criminal history, (2) he was in custody, (3) Detective Nelson intimidated him, (4) Detective Nelson made promises of leniency, (5) the interrogation was lengthy, and (6) he was not provided adequate *Miranda* warnings. He claims he was surrounded by armed police officers at the scene of his arrest, put in handcuffs, placed in a locked patrol car, and interrogated by officers without receiving

24

1    proper *Miranda* rights.  The assertion that Brodigan did not receive and waive *Miranda* warnings

2    is belied by the record.  Although he was clearly under arrest, in handcuffs, and placed in a patrol

3    car, he was not surrounded by armed officers when he was initially interviewed at the scene or

4    later at police headquarters.  At the scene, Detective Nelson told Brodigan that Brodigan was

5    giving him the "runaround" and "to think about what he wanted to tell [Detective Nelson]" and

6    then placed back into the patrol car.  Detective Nelson's statements that he believed he was being

7    given the runaround and Brodigan should think about what Brodigan wanted to tell the detective

8    later did not amount to intimidation or coercive police conduct.

9            During the interrogation at LVMPD headquarters, Brodigan claims that Detective Nelson

10   continually made promises of leniency telling Brodigan to look long term and what Brodigan told

11   Detective Nelson was probably going to determine whether he went to prison or not.  Detective

12   Nelson also told Brodigan that cooperating was "gonna help you out" and that he had a lot to gain

13   by telling the truth.  Detective Nelson told Brodigan he needed to hear Brodigan's statement about

14   what happened, there was a video Detective Nelson could use to verify his statements, and "you're

15   still responsible, but the thing is to get any kind of consideration, you gotta tell the truth."

16           The court finds the government has met its burden of showing that Brodigan's statements

17   to Detective Nelson were voluntary.  Although both Detectives Nelson and Junge were armed,

18   they were in plain clothes and their service weapons were concealed beneath their clothing.  At no

19   point during either interview did the detectives display their weapons or make any verbal or

20   physical threats.  The audio/video recording of the interrogation at police headquarters reflects that

21   Detective Nelson took a low-key conversational tone with Brodigan.  At no point did Detective

22   Nelson shout at Brodigan or display any form of physical aggression.  The audio/video recording

23   reflects that Brodigan was alert, oriented, and responsive to Detective Nelson's questions.

24           Detective Nelson repeatedly told Brodigan throughout the interview that he believed

25   Brodigan was the least culpable of the three suspects involved in the robberies and encouraged

26   Brodigan to help himself out by telling the truth.  However, Detective Nelson repeatedly advised

27   Brodigan that he was under arrest for three armed robberies, he was responsible for these crimes,

28   and he was going to jail.  When Brodigan expressed incredulity that he could be charged with

armed robbery because he did not have a gun, Detective Nelson explained why Brodigan was culpable. Detective Nelson encouraged Brodigan to tell the truth, to help himself out, and to tell Detective Nelson what happened. Detective Nelson told Brodigan to make a choice. He also told Brodigan that Castro was the one that had put him in his position and Castro was always the one with the gun but Brodigan was culpable because he was with Castro the whole time.

Detective Nelson was clearly attempting to get Brodigan to implicate Castro in the offenses. He clearly told Brodigan on multiple occasions he believed that Brodigan was the least culpable and explained to Brodigan that "all the people that get a break are the people who are honest" and "to get any consideration you gotta tell the truth." However, when Brodigan explicitly asked "[i]s there any way I can like not go to jail?", Detective Nelson told Brodigan that he was going to go to jail for robbery and burglary. Brodigan again asked, "How is this robbery though?" and Detective Nelson again explained.

The court finds that Detective Nelson did not engage any intimidating or in coercive police conduct which is a necessary predicate to finding that a confession is not voluntary. *Connelly*, 479 U.S. at 167. Detective Nelson's statement to Brodigan about getting a break by telling the truth and cooperating do not amount to impermissible police coercion. Brodigan told Detective Nelson that he did not want to implicate Castro because he did not want to be labeled as a "snitch." The Ninth Circuit has held that a promise to keep a suspect's cooperation between law enforcement and the prosecutor and to get help for the suspect is permissible. *Preston*, 706 F.3d at 1114–15; *United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002) (finding that customs agent who informed defendant that agent would let the government know if defendant cooperated and cooperation would help defendant avoid a lengthy prison sentence did not commit impermissible coercion). The Ninth Circuit has also held that imploring a suspect to tell the truth is not coercive law enforcement conduct. *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997); *see also Ortiz v. Uribe*, 671 F.3d 863, 870 (9th Cir. 2011) (telling suspect that "he had to tell the truth to pass a polygraph examination, was not coercive").

/ / /

/ / /

## CONCLUSION

The court finds that Brodigan received and waived *Miranda* warnings from a pre-printed LVMPD advisement of rights card at the scene of his arrest. The rights that were administered and read into the record complied with the requirements of *Miranda*. The court also finds that, under the totality of the circumstances surrounding both the interrogation at the patrol car and at police headquarters, Brodigan made an uncoerced choice to the speak with Detective Nelson. Brodigan was aware of both the nature of the rights being abandoned and the consequences of the decision to speak to the detective. At no point during either interview did Brodigan invoke his right to counsel. Brodigan's statements to Detective Nelson were voluntary and not the result of any form of police intimidation, coercion, or deception.

For these reasons,

**IT IS RECOMMENDED** that Brodigan's Motion to Suppress Statements (ECF No. 99) be **DENIED**.

DATED this 14th day of January 2019.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE